FILED
2026 SEP -3 PM 1:30
ALLEN H. FREEMAN
CLERK OF COMMON PLEAS
CLERMONT COUNTY, OH

**IN THE COMMON PLEAS COURT OF CLERMONT COUNTY, OHIO**
**CIVIL DIVISION**

**TOTAL QUALITY LOGISTICS, LLC,**
4289 Ivy Pointe Boulevard
Cincinnati, Ohio 45245

Plaintiff,

v.

**JACK WHITMORE,**
512 Aris Court
Raleigh, North Carolina 27615

and

**HOLLY ROAD LOGISTICS LLC**
512 Aris Court
Raleigh, North Carolina 27615

Serve also:
ZenBusiness Inc., Registered Agent
1001 Wade Avenue, Suite 327
Raleigh, North Carolina 27605

Serve also:
Arshaun Murph, FMCSA Agent
767 Hurlock Lane 119
Galloway, Ohio 43119

Defendants.

Case No.

Judge

2026CVC1325 JUDGE NAGEL

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

---

For its Verified Complaint for Damages and Injunctive Relief against Defendant Jack Whitmore ("Whitmore") and Holly Road Logistics LLC ("Holly Road"), Plaintiff Total Quality Logistics, LLC ("TQL") states as follows:

## INTRODUCTION

This case arises mainly from Whitmore's breach of his "Employee Non-Compete, Confidentiality and Non-Solicitation Agreement" (referred to herein as the "Agreement"); Defendants' tortious interference with contract/business relationships; and Defendants' misappropriation of TQL's confidential and trade secret information, used by Defendants to unfairly compete with TQL in violation of its rights described herein.

## PARTIES, JURISDICTION, AND VENUE

1. TQL is an Ohio limited liability company with its principal place of business located in Clermont County, Ohio. TQL provides freight brokerage and third-party logistics services to customers across the United States.

2. Whitmore is a North Carolina resident and former employee of TQL. Upon information and belief, he resides at 512 Aris Court, Raleigh, North Carolina 27615. Whitmore previously worked for TQL in its Richmond, Virginia and Raleigh, North Carolina offices until March 23, 2026.

3. Upon information and belief, Holly Road is a North Carolina limited liability company with its principal place of business in Raleigh, North Carolina. Holly Road provides freight brokerage and third-party logistics services.

4. Jurisdiction and venue are appropriate because the Agreement provides for Clermont County, Ohio as having an exclusive jurisdiction and venue for disputes between the parties; Whitmore had numerous contacts with Ohio through his employment with TQL, including, but not limited to, being assigned and using an Ohio phone number with a (513) area code at all times while working for TQL, accessing and using Confidential Information created, stored, and maintained at TQL's Clermont County, Ohio headquarters, and receiving wages paid out of Ohio;

all improper acts and conduct were purposely directed toward TQL's systems located at its Clermont County, Ohio headquarters; and all or part of TQL's claims for relief arose in Clermont County, Ohio.

## FACTS COMMON TO ALL COUNTS

5. TQL is a national leader in the third-party logistics industry, providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with supply-chain management across the United States.

6. TQL's Customers[1] consist of companies that want to arrange the shipment of goods from one location to another. These Customers include companies that need to ship their own goods; however, TQL's Customers also include freight brokers that have already agreed to arrange goods on behalf of another Customer but need assistance in finding a Motor Carrier and/or additional parties with whom TQL does business to fulfill the shipment.

7. TQL does not own or operate any of its own trucks or trucking equipment. Nor does TQL employ any drivers or other employees to haul or otherwise physically move freight. Rather, TQL engages and coordinates independent carriers that are able and willing to haul and ship freight at the times and places required by TQL's Customers.

8. The third-party logistics industry (and the freight-shipping industry at large) is extremely competitive. Relationships with Customers, Motor Carriers, and other brokers are critical to success. It is very common in the brokerage industry for companies to have confidentiality, non-compete, and non-solicitation agreements with their employees and contractors.

---

[1] "Customer," "Motor Carrier," and other capitalized terms are used herein in the same way they are defined in the Agreement.

9. Among other things, TQL's relationships with Customers and Motor Carriers are essential to sustained success within the industry. TQL spends a great deal of time, money, and other resources developing relationships with new Customers and strengthening relationships with existing ones.

10. Further, TQL has made substantial investments to develop and protect the secrecy of the proprietary systems, processes, and procedures that it uses to manage operations and to compete in this hyper-competitive industry.

11. TQL takes significant measures to protect its trade secrets and other confidential and proprietary information. For example, all freight brokers, as well as many other types of employees, before beginning employment with TQL, must sign restrictive covenants limiting their ability to unfairly compete with TQL, solicit TQL's Customers or employees, or disclose or misuse TQL's trade secrets and confidential and proprietary information.

12. In addition, TQL utilizes individualized passwords that are regularly changed and must be used for electronic access to proprietary and confidential information. Likewise, TQL's systems implement internal controls preventing employees from downloading or printing certain information, as well as restrictions on sending confidential information outside TQL's secured networks.

13. Whitmore worked for TQL from June 13, 2022 to March 23, 2026. Whitmore began working in TQL's Richmond, Virginia office and later transferred to TQL's Raleigh, North Carolina office.

14. Whitmore came to TQL with no prior experience in the third-party logistics industry or the freight-shipping industry at large. Therefore, TQL provided Whitmore with extensive training on matters including, among other things, its services, pricing structure, sales

strategies and techniques, Customers, Motor Carriers, and general operations. TQL's unique logistics training program is intensive and generally lasts between eight (8) to twenty-six (26) weeks.

15. Whitmore began his employment at TQL as a Logistics Account Executive Trainee and successfully completed TQL's comprehensive and unique training program. Whitmore was subsequently promoted to Logistics Account Executive, Saturday Group Leader, Senior Logistics Account Executive, and Sales Team Leader positions.

16. While working for TQL, Whitmore possessed a substantial and consistent revenue stream, including serving as the primary contact for several customer accounts, thereby placing him in a position of trust. Moreover, Whitmore served as a source of advice, training, and information for other TQL employees. Whitmore was successful as a TQL broker.

17. Throughout his employment with TQL, Whitmore acquired detailed knowledge of TQL's unique operations, including, without limitation, shipping, third-party logistics, freight and truck brokerage, and supply-chain management services. Whitmore also had access to TQL's confidential, highly-proprietary, and/or trade secret information in performing his job duties, including: access to proprietary software, operating policies and procedures, financial records (such as credit history and other similar information about current and prospective Customers, suppliers, and Motor Carriers), information about pricing and the manner and mode of doing business, the current and historical terms of TQL's business dealings and relationships with Customers and Motor Carriers, proprietary logistics and sales training materials, contracts and agreements of all kinds, sales lists and strategies, and detailed Customer and Motor Carrier lists and information.

18. Whitmore was also required to manage existing and potential business relationships with TQL Customers, prospective Customers, and Motor Carriers. Whitmore developed close relationships with and has an intimate knowledge of the business practices of TQL's Customers and the Motor Carriers that TQL contracts with to transport its Customers' freight.

19. Before commencing employment with TQL, Whitmore was required to sign, and did sign, the Agreement on June 13, 2022, a true and accurate copy of which is attached as Exhibit 1.

20. In the Agreement, Whitmore agreed, among other things, that during the course of his employment with TQL and for a period of one (1) year after employment with TQL ended, he would not: (a) directly or indirectly, own, operate, maintain, consult with, be employed by, engage in, or have any other interest in any business or entity that competes with TQL; (b) directly or indirectly solicit any of TQL's Customers, or take any action to divert work from TQL; or (c) directly or indirectly interfere or tamper with, disrupt or attempt to disrupt any contractual or business relationship TQL has with any Customers or Carriers. (See Exhibit 1 at Section 9(b).)

21. The Agreement acknowledges that TQL is an Ohio company that provides shipping, third-party logistics, freight brokerage, truck brokerage, and supply-chain management services throughout the United States. (See Exhibit 1 at p. 1.)

22. Whitmore acknowledged and agreed that TQL maintains "Confidential Information" as defined in the Agreement. (See Exhibit 1 at p. 1.)

23. The terms "Customer," "Motor Carrier," and "Competing Business" are also defined in the Agreement. (See Exhibit 1 at Section 9(f).)

24. In the Agreement, Whitmore agreed that he was placed in a position of trust as TQL's employee; was given access to its Confidential Information; and had a duty to protect such Confidential Information from unauthorized disclosure. (See Exhibit 1 at p. 2.)

25. Whitmore acknowledged and agreed that TQL's Confidential Information, whether or not formally designated as such, was vital to the success of TQL's business and that any unauthorized use or disclosure of TQL's Confidential Information would cause TQL substantial and irreparable harm. (See Exhibit 1 at p. 2.)

26. Whitmore also agreed that TQL's Confidential Information is a trade secret, a valuable asset of TQL's business that gives TQL an advantage over competitors. (See Exhibit 1 at p. 2.)

27. Whitmore promised that he would at all times refrain from using, sharing, or disclosing TQL's Confidential Information to any individual or business entity (except as authorized by TQL in the conduct of TQL's business or as required by law). Whitmore further agreed that he would not make use of TQL's Confidential Information for the benefit of anyone other than TQL. (See Exhibit 1 at Section 9(c).)

28. Whitmore acknowledged that association with a business competitive with TQL would inevitably result in him revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL. (See Exhibit 1 at Section 7.)

29. Whitmore further agreed that the running of the one (1) year non-competition restriction would be tolled during any time period during which he was in violation of any provision of the Agreement. (See Exhibit 1 at Section 9(b)(v).)

30. Whitmore further agreed that a breach of any part of the Agreement would entitle TQL to an injunction, actual damages, and attorney's fees. (See Exhibit 1 at Section 9(e).)

31. In consideration of the Agreement, as set forth above, TQL hired Whitmore and/or continued to employ him. TQL would not have provided Whitmore with such extensive training, allowed him to gain knowledge of its proprietary Customer information, or given him access to any of its Customers and prospective Customer relationships had he not executed the Agreement.

32. Whitmore's employment with TQL was terminated on March 23, 2026.

33. TQL recently discovered that Whitmore has been unfairly competing against TQL by working for Holly Road within the restricted period set forth in the Agreement.

34. Upon information and belief, Whitmore is the owner and operator of Holly Road and started Holly Road shortly after leaving TQL.

35. Holly Road maintains active brokerage authority through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA").

36. Holly Road is a "Competing Business" as defined in the Agreement.

37. Accordingly, per the express terms of the Agreement, Whitmore is prohibited from owning, operating, and/or working for Holly Road during the time periods set forth therein.

38. TQL has also discovered that Whitmore is soliciting and moving freight for his former TQL Customers in violation of his Agreement.

39. Whitmore has been in ongoing violation of his Agreement, and the obligations contained therein have been tolled during all periods of violation as provided for in the Agreement.

40. Upon information and belief, Whitmore is working for Holly Road in the same or similar position he held with TQL. Given that Whitmore has assumed a similar, if not the same, role that he had during his employment with TQL, it is inevitable that he will use TQL's Confidential Information to unfairly compete with TQL, in violation of the Agreement, if he is permitted to continue operating and/or working for Holly Road.

41. As a result of Defendants' conduct, TQL seeks monetary damages in an amount to be proven at trial, believed to be in excess of $25,000, as well as injunctive and other relief described below.

**COUNT ONE – BREACH OF CONTRACT**
**(Against Defendant Whitmore)**

42. TQL incorporates each of the preceding Paragraphs of this Complaint as if fully restated here.

43. TQL and Whitmore entered into the Agreement on June 13, 2022, freely and without duress.

44. The Agreement is a valid and legally enforceable contract that governs Whitmore's post-employment conduct to the extent described therein.

45. In exchange for Whitmore's commitment to be bound by the Agreement, TQL provided Whitmore with adequate and sufficient consideration, including, without limitation, ongoing employment and/or new position(s), compensation, extensive training, and continued access to TQL's Confidential Information to assist with his professional development.

46. Section 9 of the Agreement provides for a one-year period following employment during which Whitmore is prohibited from accepting employment or affiliation or association with competitors of TQL. Section 9 also provides for the tolling of that one-year period during any time period during which Whitmore is in violation of any provision of the Agreement.

47. TQL fully performed all of its obligations under the Agreement.

48. Upon information and belief, Whitmore has breached the Agreement by, among other things, failing to abide by the confidentiality obligations discussed above, misappropriating TQL's trade secrets, starting and working for a Competing Business, soliciting TQL's current and/or former employees, and/or soliciting TQL's Customers and/or Motor Carriers.

49. As a direct and proximate result of these breaches, TQL has been damaged in an amount to be proven at trial.

50. Monetary damages alone will be insufficient to remedy the harm caused to TQL by Whitmore's breach of the Agreement. As a direct and proximate result of Whitmore's actual or threatened unlawful conduct, TQL has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

51. Whitmore agreed that a breach or threatened breach of any part of the Agreement entitled TQL to an injunction.

52. TQL is entitled to injunctive relief to prevent any such further unlawful conduct.

53. Pursuant to the Agreement, TQL is also entitled independently to recover the attorney's fees and costs expended as a result of Whitmore's conduct, in an amount to be proven at trial and/or through appropriate post-trial motions.

54. Therefore, TQL requests a temporary restraining order, preliminary injunction, and/or a permanent injunction prohibiting Whitmore from further breaches of his Agreement, with tolling during the period of any violations, as appropriate.

**COUNT TWO – TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Defendant Holly Road)**

55. TQL incorporates each of the preceding paragraphs as if fully rewritten here.

56. TQL's Agreement with Holly Road is a valid and binding contract.

57. At all relevant times, Holly Road knew or should have known of TQL's Agreement with Whitmore.

58. Upon information and belief, Holly Road knowingly and intentionally procured and/or continued to permit Whitmore to breach his contractual obligations to TQL under the Agreement without any justifiable excuse.

59. Upon information and belief, as a direct and proximate result of Holly Road's conduct, TQL has been and/or inevitably will be damaged by, among other things, the loss of sales revenue, Customer and Motor Carrier relationships and goodwill, and fair competition. TQL has suffered monetary damages in an amount to be proven at trial.

60. Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Holly Road's tortious interference with TQL's contracts as described above. As a direct and proximate result of Holly Road's unlawful conduct, TQL has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

61. TQL is entitled to injunctive relief to prevent any such further unlawful conduct.

62. Therefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Holly Road from tortiously interfering with the Agreement and with TQL's other contracts with its current and former employees. TQL further requests recovery of attorney's fees, compensatory damages, and punitive damages as permitted by law.

63. Because Holly Road's conduct has been intentional, willful, and malicious, TQL is additionally entitled to an award of punitive damages.

**COUNT THREE – TORTIOUS INTERFERENCE WITH CONTRACT/BUSINESS RELATIONS**
**(Against All Defendants)**

64. TQL incorporates each of the preceding paragraphs as if fully rewritten here.

65. TQL has contractual and/or business relationships with its Customers and Motor Carriers, of which Defendants have had knowledge at all relevant times.

66. Despite this knowledge, Defendants have knowingly and intentionally interfered with these contractual and/or business relationships, and inevitably will continue to do so, for their own benefit.

67. Defendants are acting tortiously, willfully, and maliciously, without any justifiable excuse, and in bad faith.

68. As a direct and proximate cause of Defendants' conduct, TQL has been and/or inevitably will be damaged by, among other things, the loss of sales revenue, Customer and Motor Carrier relationships and goodwill, and fair competition. TQL has suffered monetary damages in an amount to be proven at trial.

69. Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Defendants' tortious interference. As a direct and proximate result of Defendants' actual or threatened unlawful conduct, TQL has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

70. TQL is entitled to injunctive relief to prevent any such further unlawful conduct.

71. Because Defendants' conduct has been intentional, willful, and malicious, TQL is additionally entitled to an award of punitive damages.

**COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS UNDER OHIO STATE LAW ONLY**
**(Against All Defendants)**

72. TQL incorporates the preceding paragraphs as if fully rewritten here.

73. TQL has trade secrets and develops and maintains confidential and highly proprietary information, including, among other items, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, Motor Carriers and Motor Carrier lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers and vendors), marketing, and sales lists and strategies.

74. TQL's Confidential Information also includes its extensive and unique training program, which TQL develops and maintains for the purpose of training its new employees, many of whom have no prior experience in the logistics industry.

75. TQL's Confidential Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, including TQL's competitors. And this information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy including conditioning employee access of TQL's systems upon use of constantly changing passwords, restricting employees from downloading or printing certain information, and requiring employees to agree to sign an agreement containing confidentiality and restrictive covenant provisions similar to Whitmore's Agreement.

76. TQL has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain this information.

77. TQL's Confidential Information is protected, in whole or in part, as a trade secret under applicable state law.

78. Defendants' misconduct and wrongful taking, use, and/or inevitable use of TQL's Confidential Information constitutes misappropriation under applicable state law, because Defendants have used, are threatening to use, and/or inevitably will use the Confidential Information to unfairly compete with TQL.

79. Defendants knew or should have known that they acquired those trade secrets by and/or were using them for improper means, and had clear knowledge that they only had access to the protected information under circumstances giving rise to a duty to maintain the information's secrecy.

80. Upon information and belief, Defendants have willfully misappropriated, threatened to misappropriate, and/or inevitably will misappropriate TQL's trade secrets including, among other things, TQL's proprietary technology, Customer and Motor Carrier identities, lists, and contact information, as well as other Customer and Motor Carrier information, for use against TQL and for their own benefit, within the meaning of applicable state law. This includes any information that Whitmore has shared and/or inevitably will share with Holly Road.

81. As a direct and proximate result of Defendants' conduct, TQL has been damaged by, among other things, the loss of sales revenue, Customer relationships and goodwill, and fair competition. TQL has suffered monetary damages in an amount to be proven at trial.

82. Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Defendants' misappropriation. As a direct and proximate result of Defendants' actual or threatened misappropriation of TQL's trade secrets, TQL has suffered, and will continue to suffer, immediate, substantial, and irreparable harm for which there is no adequate remedy at law.

83. Therefore, TQL requests a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Defendants' further use and misappropriation of TQL's trade secrets, with restrictive covenants extended through tolling as appropriate. TQL further requests recovery of attorney's fees and punitive damages as permitted by law, because Defendants' conduct has been intentional, willful, and malicious.

**COUNT FIVE – REPLEVIN**
**(Against All Defendants)**

84. TQL incorporates each of the preceding paragraphs as if fully rewritten here.

85. TQL has developed and is the owner of confidential, proprietary, and/or trade secret information including, among other items, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, Motor

Carriers and Motor Carrier lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers, Motor Carriers, and vendors), marketing, and sales lists and strategies.

86. TQL has the right to immediate possession of the above referenced information because TQL is the rightful owner of that information, including its Confidential Information as defined in the Agreement.

87. Upon information and belief, Defendants have in their possession and are wrongfully retaining some or all of the above referenced information and refusing to return it to TQL, including any such information that Whitmore has shared and/or inevitably will share with Holly Road.

88. Accordingly, TQL is entitled to the immediate return of any of the above referenced information that is in Defendants' possession, custody, or control as well as any monetary damages caused by Defendants' wrongful withholding of the same, in an amount to be proven at trial.

**COUNT SIX – CONVERSION**
**(Against All Defendants)**

89. TQL incorporates each of the preceding paragraphs as if fully rewritten here.

90. TQL has developed and is the owner of confidential, proprietary, and/or trade secret information including, among other things, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, Motor Carriers and Motor Carrier lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers, Motor Carriers, and vendors), marketing, and sales lists and strategies.

91. TQL has the right to immediate possession of the above referenced information because TQL is the rightful owner of that information, including its Confidential Information as defined in the Agreement.

92. Upon information and belief Defendants have wrongfully deprived TQL of possession of the above-referenced information by taking possession of it, using it, and refusing to return it to TQL, including any such information that Whitmore has shared and/or inevitably will share with Holly Road.

93. As a direct and proximate cause of Defendants' conduct, described above, TQL has suffered monetary damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** TQL respectfully requests that this Court issue judgment in its favor as follows:

a. On Count One, as against Whitmore, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order and preliminary and permanent injunctive relief, along with other relief, such as attorney's fees, and additional relief to be addressed in forthcoming motions;

b. On Count Two, as against Holly Road, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order and preliminary and permanent injunctive relief, and award attorney's fees, compensatory damages, and punitive damages as permitted by law;

c. On Count Three, as against all Defendants, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order

and preliminary and permanent injunctive relief, and award attorney's fees, compensatory damages, and punitive damages as permitted by law;

d. On Count Four, as against all Defendants, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order and preliminary and permanent injunctive relief, and award attorney's fees, compensatory damages, and punitive damages as permitted by law;

e. On Count Five, as against all Defendants, award specific performance by directing Defendants to immediately return to TQL any confidential or proprietary information of TQL, including but not limited to, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, Motor Carriers and Motor Carrier lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers, Motor Carriers, and vendors), marketing, sales lists and strategies, and any and all of TQL's Confidential Information;

f. On Count Six, as against all Defendants, award monetary damages in an amount to be determined at trial as further described above;

g. Order Defendants to pay court costs, prejudgment interest, and post judgment interest, and award any such other or further relief that this Court deems just and proper or that justice may require.

Respectfully submitted,

DINSMORE & SHOHL LLP

Matthew J. Bakota (0079830)
Callum S. Morris (0096817)
Emily M. Snively (0104656)
1 South Main Street, Suite 1300
Dayton, Ohio 45402
Phone: (937) 449-6400
Fax: (937) 449-6405
matthew.bakota@dinsmore.com
callum.morris@dinsmore.com
emily.snively@dinsmore.com

Michael B. Mattingly (0089847)
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Phone: (513) 977-8200
Fax: (513) 977-8141
michael.mattingly@dinsmore.com

*Attorneys for Plaintiff Total Quality Logistics, LLC*

**TO THE CLERK:**

Please serve Defendants by certified mail, return receipt requested. Thank you.

**VERIFICATION**

STATE OF OHIO )
) ss:
COUNTY OF CLERMONT )

I, Marc Bostwick, being duly cautioned and sworn, state that I am authorized to act as an agent of Plaintiff for the purpose of verifying the Complaint herein, in accordance with the Ohio Rules of Civil Procedure. To the extent I have personal knowledge of the matters alleged in the Complaint, the information is true and accurate to the best of my knowledge and belief. As to any matters for which I do not have personal knowledge, I am authorized by Plaintiff to state that Plaintiff is informed and believes that the allegations of the Complaint are true and accurate to the best of its knowledge and belief.

Marc K. Bostwick

Marc K. Bostwick
(Printed name)

**NOTARY PUBLIC**

Subscribed and sworn by ______ before me, a Notary Public,

on this 2 day of September, 2026.

Notary Public

NOTARIAL SEAL STATE OF OHIO

JAMES MAXWELL WILLIAMS
ATTORNEY AT LAW
NOTARY PUBLIC STATE OF OHIO
MY COMMISSION HAS NO EXPIRATION DATE
SECTION 147.03 O.R.C.

**COMMON PLEAS COURT - GENERAL DIVISION**
**CLERMONT COUNTY, OHIO**

**ALLEN M. FREEMAN**
Clerk of Courts

**CLASSIFICATION FORM**-Per: Sup. R.s 5, 36 and SRF Form A

This form must be completed by Plaintiff/Appellant/Applicant/Petitioner and filed with the complaint, appeal, application, or petition in all civil actions and filed with the Clerk

TOTAL QUALITY LOGISTICS, LLC
______________________
Plaintiff

VS

JACK WHITMORE
&
HOLLY ROAD LOGISTICS, LLC
______________________
Defendants

2026CVC1325 JUDGE NAGEL

Judge: ______________

Case # ______________

(to be completed by the Clerk)

FILED
2026 SEP -3 PM 1:29
ALLEN M. FREEMAN
CLERK OF COMMON PLEAS
CLERMONT COUNTY, OH

ATTORNEY/Pro Se Party: Matthew J. Bakota

SUPREME COURT NO.: 0079830

ADDRESS: Dinsmore & Shohl LLP, 1 South Main Street, Suite 1300, Dayton, OH 45402

TELEPHONE NO.: (937) 449-6400

EMAIL ADDRESS: matthew.bakota@dinsmore.com

**CASE CATEGORY: SRF FORM A**

A.____ Professional Tort: ___medical___legal___other/type______________

B.____ Product Liability: general nature______________

C. X Other Torts: general nature Unfair Competition; Trade Secrets

D.____ Workers Compensation

E.____ Foreclosure: ____mortgage____tax____other lien/type______________

F.____ Administrative Appeal: agency, board, department______________

G.____ Complex Litigation Requested Under Sup. R. 42

H.____ Other Civil: general nature______________

I. ____ Criminal

Jury Demand: _____ YES  X  NO

Is this case a refiled case? _____ YES  X  NO

(If yes prior case no:____________ Prior Assigned Judge______________)

(This information is required by Sup. R. 36(D) and Local R. 1.4 and must be completed)

# TOTAL QUALITY LOGISTICS, LLC

## Employee Non-Compete, Confidentiality and Non-Solicitation Agreement

## (Virginia)

This Employee Non-Compete, Confidentiality and Non-Solicitation Agreement ("Agreement") is entered into by and between Total Quality Logistics, LLC ("TQL"), 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245, and the Employee whose name is set forth below his or her signature on the last page of this Agreement and whose address is on file with TQL ("Employee"). Performance under this Agreement will begin on the date Employee's employment with TQL actively begins.

## RECITALS:

**WHEREAS**, TQL is an Ohio limited liability company providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary companies, all related entities, and its successors and assigns;

**WHEREAS**, TQL is unique within the organizations providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). TQL has spent extensive time developing its goodwill and its relationships with Customers, Motor Carriers, suppliers, and others within the Industry. TQL provides extensive training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Motor Carriers, suppliers, contact information, lanes, pricing, sales strategy, service, and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it would have value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns and is trained in at TQL would necessarily cause unfair competition if Employee took employment competitive to TQL;

**WHEREAS**, TQL develops and maintains confidential proprietary information (hereinafter referred to as, "Confidential Information"), including but not limited to, its operating policies and procedures; computer databases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Motor Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Motor Carriers; financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers, Motor Carriers, and vendors; pricing, marketing, and sales lists and strategies; Customer lists and Motor Carrier lists including contact names, physical and email addresses, telephone numbers, compilations of such information, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures. Confidential Information



**EXHIBIT 1**

also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. This information may be in tangible written form, computer databases, electronically stored information or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written or electronic form. Confidential Information may be protected by patents, copyrights, or other means of protection. Confidential Information does not include information that is protected by the National Labor Relations Act ("NLRA"), and nothing in this Agreement shall be interpreted to prohibit employees from engaging in protected activity under the NLRA, including without limitation discussing wages, hours, or terms and conditions of employment. TQL will not prohibit or discipline any of its employees from or for discussing their wages, hours, or other terms and conditions of employment or engaging in any other activity protected by the NLRA;

**WHEREAS**, Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential proprietary information by TQL;

**WHEREAS**, in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business;

**WHEREAS**, Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL;

**WHEREAS**, Employee acknowledges that TQL's Customer and Motor Carrier lists, other information about TQL's Customers and Motor Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the Industry;

**WHEREAS**, in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties; and

**WHEREAS**, Employee desires to be employed by TQL and TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and agrees to be bound by it.

**NOW THEREFORE**, in consideration of the employment or continued employment of Employee by TQL, including compensation and benefits provided by TQL, and the terms, conditions, and covenants, set forth herein, which Employee considers adequate consideration for the promises contained herein, TQL and Employee agree as follows:

1. Recitals. The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth again.

2. Employee Duties. Employee shall undertake and assume the responsibility of performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time and from time-to-time. It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including but not limited to, any salary, other cash compensation, and benefits.

3. At-will Employment. Employee is an employee at-will. Nothing in this Agreement changes Employee's status as an at-will employee. Either TQL or Employee may terminate Employee's employment for any reason at any time.

4. TQL Owns Confidential Information. All Confidential Information as described herein is proprietary and the sole property of TQL.

5. Confidential Information Is for TQL's Use Only. Unless Employee has prior written consent from TQL, Employee shall not at any time during the course of his or her employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business.

6. Return of Company Property. Upon termination of employment or upon request by TQL for any reason, Employee will immediately deliver to TQL all originals and all copies of all documents and other materials obtained from or belonging to TQL, including but not limited to all Confidential Information, regardless of form, in Employee's possession, custody, or control, including but not limited to any TQL files, documents (including any containing customer information), computer data, or other media however stored, and Employee will retain no copy of any such document, data, or other materials.

7. Presumption Regarding Confidential Information. Employee agrees that, during the time limits of the covenants identified in Section 9(b), if Employee performed work or services for a Competing Business, as defined in Section 9 below, that are the same as, or substantially similar to, the work or services Employee performed for TQL, it will be presumed to necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

8. Property Rights and Assignment. Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the absolute property of TQL and shall promptly be disclosed by Employee to TQL. Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL. To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or

helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

9. Covenants and Remedies.

(a) Agreement to Covenants and Material Breach. The Employee hereby covenants and agrees to the terms and conditions of the restrictive covenants and agreements set forth in Sections 4 through 9 of this Agreement, and agrees that any breach thereof shall constitute a material breach by the Employee of his or her obligations under this Agreement.

(b) Covenants. Employee agrees that, during the course of his or her employment (except as required in the course of Employee's employment with TQL), and for a period of one (1) year after termination or cessation of Employee's employment for any reason:

(i) Employee will not, directly or indirectly, perform work or services that are the same as, or substantially similar to, the work or services Employee performed for TQL for any Competing Business (as defined below), except the ownership of less than 1% of the outstanding equity securities of any publicly-held corporation or entity;

(ii) Employee will not, directly or indirectly, solicit any known Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action that Employee knows (or should know) would divert business from TQL;

(iii) Employee will not, directly or indirectly, interfere with, tamper with, disrupt, use, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any known Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; and

(iv) Employee will not, directly or indirectly employ, recruit, solicit, or assist others in employing, recruiting, or soliciting for any Competing Business any person who is, or within the previous one (1) year has been, an employee of, or consultant with, or been party to another business relationship with TQL.

(v) It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

(c) Trade Secrets. The Employee recognizes and acknowledges that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of Employee's duties hereunder. Employee will not hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, except as required by law, nor shall Employee make use of any such property for Employee's own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance.

(d) Reasonableness of Restrictions. Employee recognizes that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information and unfair competition.

(e) Injunction. If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach. Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee. If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL.

(f) For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom Employee knew that TQL has rendered any service within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment, and also includes any active prospect for whom Employee knew TQL has planned and/or made contact for the purpose of rendering any service within the six (6) months immediately preceding the termination or cessation of Employee's employment,; (ii) the term "Motor Carrier" is any over-the-road shipper, carrier, trucker, or hauling business that Employee knew has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) "Competing Business" is any person, firm, corporation, or entity that is engaged in third-party logistics services, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) "solicit" includes, but is not limited to, any efforts in any form intended to take business away from, intercept, or interfere with the business of TQL, including relationships with TQL and its employees, Customers, Motor Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any known Customer or Motor Carrier.

(g) Pursuant to the Defense of Trade Secrets Act, 18 U.S.C. § 1833(b), an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made (1) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to the court order.

10. Governing Law, Jurisdiction, and Venue. This Agreement shall be interpreted and enforced under the laws of the Commonwealth of Virginia or Ohio, without giving effect to conflict of law provisions which would result in the application of any law other than Virginia or Ohio law. Any action, suit, or proceeding with respect to or arising out of this Agreement shall be brought in a state or federal court in Richmond, Virginia or in the Common Pleas Court of Clermont County, Ohio or the United States District Court for the Southern District of Ohio. Further,

Employee consents to the personal jurisdiction of the state and/or federal courts of Virginia or Ohio, consents to service of process therefrom, and waives any other requirements with respect to personal jurisdiction, venue, or service of process.

11. Severability. Should any of the provisions of this Agreement be declared or determined to be illegal or invalid, (a) the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not a part of this Agreement; and (b) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

12. Personnel Policies. Employee agrees to abide by TQL's rules, regulations, policies, and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion. TQL's written rules, policies, practices, and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern. However, such rules, policies, practices, and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time. Additional contractual obligations or other modifications of this Agreement may be made only by an express written agreement between Employee and TQL.

13. No Conflicting Employee Agreement. Employee represents that Employee is not bound by any agreement or contract or other duty to a former employer or any other party which would prevent Employee from complying with any obligations hereunder or performing his or her duties as an employee of TQL.

14. Acknowledgments. Employee acknowledges and agrees that he or she:

(a) has had sufficient time within which to consider this Agreement before executing it;
(b) has carefully read and fully understands all of the provisions of this Agreement;
(c) knowingly and voluntarily agrees to all of the terms set forth in this Agreement;
(d) knowingly and voluntarily intends to be legally bound by this Agreement;
(e) has had sufficient opportunity to obtain and consult with his or her own lawyer regarding this Agreement; and
(f) has knowingly and voluntarily executed this Agreement.

In light of the above acknowledgements, Employee further agrees that in the event that there is any ambiguity or question as to the interpretation or meaning of a term herein, a court will construe the document as if it was jointly drafted by the parties hereto.

15. Binding Agreement. This Agreement shall be binding and enforceable upon the parties hereto, their heirs, representatives, successors, and assigns. This Agreement is not assignable by Employee, but is fully assignable by TQL without notice or consent from the Employee.

16. Entire Agreement. This Agreement sets forth the entire agreement between the parties hereto pertaining to the subject of this Agreement, and fully supersedes in all respects any and all prior oral or written agreements or understandings between the parties hereto pertaining to the subject of this Agreement, including, but not limited to, any prior non-compete. This Agreement may be amended or modified only upon a written agreement signed by both of the

parties hereto. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one Agreement.

**IN WITNESS WHEREOF**, the parties agree that this Agreement may be signed by electronic means, and by their electronic endorsement through TQL's system or their physical signature below, the parties intend to sign this Agreement and acknowledge that they have read this Agreement in its entirety; understand the terms of this Agreement; have had the opportunity to consult with legal counsel regarding the terms of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

**EMPLOYEE:** **TOTAL QUALITY LOGISTICS, LLC**

| | | | | | | |
|---|---|---|---|---|---|---|
| Non-Compete - Virginia | 12/24/2019 | Non-Compete (Virginia 12-15-19).pdf | e-signature | Jack Whiteside (Terminated) (47796) | 06/13/2022 12:40:51 PM | By selecting the "I Agree" button below, I acknowledge that I have received this document; read it in its entirety; understand the terms, conditions and requirements the document places on me; have had the opportunity to consult with legal counsel regarding the terms of the document; and knowingly, voluntarily, and willfully agree to comply with the terms of the document. |
| Non-Compete - Virginia | 12/24/2019 | Non-Compete (Virginia 12-15-19).pdf | e-signature | Dan Best (Terminated) (37916) | 06/14/2022 10:40:52 AM | By selecting the "I Agree" button below, I acknowledge that I have received this document; read it in its entirety; understand the terms, conditions and requirements the document places on me; have had the opportunity to consult with legal counsel regarding the terms of the document; and knowingly, voluntarily, and willfully agree to comply with the terms of the document. |